**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DONALD JACKSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 22-1244 |
| v. ) | |
| ) | Judge Nora Barry Fischer |
| SPINNAKER INSURANCE COMPANY, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM ORDER**

Presently pending before this Court is Defendant's June 9, 2025 Motion for Recusal of Federal District Judge Nora Barry Fischer, brought pursuant to 28 U.S.C. § 455(b)(1) and alleging that recusal is necessitated by the objective appearance of "personal bias or prejudice" and/or reasonable "doubts concerning the Judge's partiality." (Docket No. 85 at ¶¶ 12-14). Upon careful consideration of said Motion, together with oral argument heard on the matter before this Court the day of its filing,[1] and the prior record, all as set forth below, Defendant's Motion will be denied. Plaintiff's allegations of personal bias or partiality are wholly without merit; Plaintiff has not met any standard for recusal; nor is the Court aware of any basis for recusal in this matter.

**I.   RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**

The general factual background was provided in detail in the Court's January 28, 2025 Memorandum Opinion on Defendant's Motion for Summary Judgment. (Docket No. 63).[2] The Court notes that this residential insurance coverage case was transferred in August, 2022, the initial

---

[1] (Docket No. 90 (Transcript of Video Conference/Oral Argument)).

[2] *See id.* (denying dismissal of Plaintiff's coverage claim – a determination reached through the supplemental legal analysis and additional case citations in Plaintiff's favor provided in the Court's 22-page opinion). *Cf.* Docket No. 54.

1

case management conference was held on October 11th, and the case was unsuccessfully mediated on October 24th. (Docket Nos. 1, 15, and 21). Discovery – on this claim arising from loss by fire within approximately seven months of the Sheriff's sale purchase and insurance of the property – was initially to have been completed by January, 2023, but the Court provided lenity to both parties to enable full development of their cases, extending discovery at the parties' request six (6) times during 2023, and again in January and March, 2024, when it was extended to May 31, 2024. At the July 1, 2024 post-discovery status conference, Plaintiff was granted a further extension to the month's end to complete a final deposition, and motions on summary judgment were scheduled, with a hearing on October 24, 2024. (Docket Nos. 47 and 61; *see also* Docket No. 62 (Transcript)).

After the Court's January, 2025 Order on summary judgment, there followed Defendant's motion for bifurcation and the parties' competing motions in limine regarding damages evidence, all of which were heard at oral argument on May 1st (Docket No. 81) (Transcript, docketed May 19th) and succinctly ruled on in the Court's recent Memorandum Order of May 27, 2025. (Docket No. 82). That Order granted Defendant's request for bifurcation of trial as to liability and damages in accordance with the guidelines of Rule 42(b) and denied both motions in limine, finding that (a) Plaintiff's contention - that Defendant should be precluded from disputing Plaintiff's estimated replacement cost on grounds that it was within the policy limits of liability – was meritless, and (b) an essentially reiterative holding on Defendant's motion was unnecessary. Late in the morning of June 9th (on which date a pre-trial status conference had been set for 4:30 p.m.), Plaintiff notified the Court that he would be filing a Motion for Recusal (in case the Court wished to obtain a Court reporter), and said motion was docketed that afternoon.

Plaintiff did not file a brief in support of his motion, despite the Court's Practices and Procedures, which require it. *See* Practices and Procedures of Judge Nora Barry Fischer, § II. B.

2

"Briefs". He also declined the Court's invitation(s) to yet file an accompanying brief, electing instead to stand on his 3-page motion and averments in argument. (Docket No. 90 at 8:10-14, 9:7-10) (indicating a willingness to do so if the Court required or preferred). Defendant also rested on its oral argument, electing not to further respond with a brief in opposition. (*Id.* at 8:4-5). *See* also *id.* at 10:22-23; Section III, *infra*. The Court then deferred further conference consultation, entry of the anticipated pretrial order, and any referral for a judicial settlement conference, pending the resolution of Plaintiff's motion for recusal, which it took under advisement. (Docket No. 87).[3]

## II.  APPLICABLE LEGAL STANDARD

Claims that a federal district judge should recuse in an ongoing litigation are generally examined under 28 U.S.C. § 144 or 28 U.S.C. § 455. The former is neither cited nor applicable here, as it requires that the moving party make and file a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party. 28 U.S.C. § 144.

Section 455(a) provides that "[a]ny justice, judge, or magistrate of the United States shall disqualify [herself] in any proceeding in which [her] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). That is, it deals with recusal, or disqualification, on the basis of the appearance of partiality, as opposed to actual bias. *See U.S. v. Furst*, 886 F.2d 558, 580 (3d Cir. 1989). Under Section 455(a), recusal is required when a reasonable person, with knowledge of all of the circumstances, would harbor doubts as to the judge's impartiality.[4] *See SEC v. Antar*, 71 F.3d 97, 101 (3d Cir. 1995). Section 455(b)(1) – the section specified in Plaintiff's motion - further

---

[3] An Order was entered the following day (Docket No. 88) as to the Stipulation submitted by the parties, in accordance with their concurrence during the June 9th hearing. (Docket No. 90 at 6).

[4] *In re Kensington Int'l Ltd.*, 353 F.3d 211, 220 (3d Cir. 2003); *In re Prudential Ins. Co. of America*, 148 F.3d 283, 343 (3d Cir.1998); *United States v. Antar*, 53 F.3d 568, 574 (3d Cir.1995).

3

provides that "[she] shall also disqualify [herself]" . . . [w]here [she] has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding". *Id.* at § 455(b)(1). In the interest of completeness and justice, the Court has considered whether any basis for recusal exists under either of these statutory provisions.

In addition, while under section 144 the Court accepts the facts alleged in the requisite affidavit and the certified good faith of the pleader as true,[5] the weight of authority holds that when deciding a motion for recusal under Section 455, the Court need not accept the movant's allegations as true. *Cooney v. Booth*, 262 F. Supp.2d 494, 504 (E.D. Pa. 2003) (citing *In re Martinez–Catala*, 129 F.3d 213, 220 (1st Cir. 1997); *United States v. Greenough*, 782 F.2d 1556, 1558 (11th Cir. 1986) ("Section 455 does not require the judge to accept allegations by the moving party as true"); *Phillips v. Joint Legislative Comm.*, 637 F.2d 1014, 1019–20 n. 6 (5th Cir. 1981)). Instead, the presiding judge may contradict the movant's factual allegations with facts derived from the judge's knowledge and the record. *Id.* (citing *Mass. Sch. of Law at Andover, Inc. v. American Bar Ass'n*, 872 F.Supp. 1346, 1349 (E.D.Pa. 1994); *see also Martinez–Catala*, 129 F.3d at 220 ("To the extent that facts are in dispute, factual determinations are made by the judge whose recusal is in question.")). In neither case does the Court accept a movant's suspicions, conjecture, speculation or surmises. *Cf. Mims*, 541 F.2d at 417; *United States v. Morrison*, 153 F.3d 34, 48 (2d Cir. 1998) ("[W]here an interest is not direct, but is remote, contingent, or speculative, it is not the kind of interest which brings into question a judge's impartiality"); *Bumpus v. Uniroyal Tire* Co., 385 F.Supp. 711, 715 (E.D.Pa. 1974) ("Subjective conclusions or opinions that bias or the appearance of impropriety may exist are insufficient to require a judge's disqualification."). And where a

---

[5] *See Berger v. United States*, 255 U.S. 22, 33–34, 41 S.Ct. 230, 65 L.Ed. 481 (1921) (interpreting the predecessor to section 144).

motion is not predicated on extrajudicial knowledge of disputed evidentiary facts, the Judge's opinions and remarks must reveal a "deep-seated" or "high degree" of "favoritism or antagonism that would make fair judgment impossible" in order to warrant recusal. *See United States v. Wecht*, 484 F.3d 194, 213 (3d Cir. 2007) (citing *United States v. Bertoli*, 40 F.3d 1384, 1412 (3d Cir. 1994) and quoting *Liteky v. United States*, 510 U.S. 540, 555-56, 114 S.Ct. 1147, 127 L.Ed. 2d 474 (1994)).

Finally, judges are not to recuse themselves lightly. Indeed, it is "vital to the integrity of the system of justice that a judge not recuse [herself] on unsupported, irrational or highly tenuous speculation." *Cooney*, 262 F.Supp.2d at 508 (citing *Hinman v. Rogers,* 831 F.2d 937, 939 (10th Cir. 1987)); *see also McCann v. Commc'n. Design Corp.,* 775 F.Supp. 1506, 1523 (D.Conn. 1991). And the judge has an "affirmative duty not to recuse [herself] if the movant fails to establish a reasonable doubt concerning [her] impartiality." *Grand Entertainment Group Ltd. v. Arazy,* 676 F.Supp.616, 619 (E.D.Pa. 1987).[6]

### III. OVERVIEW OF PARTIES' ARGUMENTS

Plaintiff accuses this Court of "troubling" and disqualifying conduct regarding its inquiries into and statements as to (a) the existence and status of Plaintiff's criminal proceedings and (b) Plaintiff's employment status, both of which he objects to as "irrelevant" to the matters before the Court and thus objectively indicative of personal bias and/or prejudice (*i.e.*, partiality). (*See generally*, Docket No. 85). In particular, Plaintiff takes issue with two statements made by the Court during the May 1st hearing. He correctly recounts that (a) "[d]uring the discussion of

---

[6] A judge is presumed to be impartial, and the party seeking disqualification bears the burden of evidencing legally sufficient facts to the contary. *See, e.g.*, *Kuperman v. State of New Hampshire*, Civ. A. No. 09-cv-66-JD, 2009 WL 1026413, at *1 (D.N.H. Apr. 15, 2009) (quoting *United States v. Dehghani*, 550 F.3d 716, 721 (8th Cir. 2008)).

5

availability of witnesses and parties . . ., the Court stated that [Plaintiff ], unless he is in jail, will have plenty of time to be here";[7] and (b) when the Court (in discussion of damages) asked what steps Plaintiff had taken toward rebuild/replacement of the property, and counsel replied by identifying Plaintiff's "problem" (*i.e.*, his inability to take (of record, virtually any) steps) as Defendant's coverage denial,[8] the Court responded that "if Plaintiff had a job, maybe he would have the money to go out and do these things." (*Id.* at ¶¶ 8-10).  Movant characterizes these exchanges, respectively, as the Court's (a) "noteworthy and troubling" re-raising, "of [its] own volition", of "the [inadmissible] matter" of "Plaintiff's pending charges"; and (b) "concerning" and "unsolicited reference" to Plaintiff's employment status, which "should not be a matter that has any bearing on the duties owed by Defendant to its insured". (*Id.* at ¶¶ 16-19).[9]  And he avers that Plaintiff, having been made aware of them, "is concerned that he will not be able to receive a fair trial and that his prior employment status and the unfounded [criminal] charges that were made against him may cause the Court to treat him differently." (*Id.* at ¶ 22). (*See also* Docket No. 90 at 10:3-12) (averring Plaintiff's intention to base its motion on "simply the appearance of bias").[10]

In its oral argument response, Defendant averred that the Court's inquiry regarding Plaintiff's pending criminal charges was appropriate, both because it could potentially have become admissible and because, as the Court stated, it was relevant to Plaintiff's availability for

---

[7] (Docket No. 90 at 28:9-10).

[8] "Defendant can't ask that we spend money on an engineer and architect to comply with the terms of a policy that they have denied.  So that is [Plaintiff's] problem."  (Docket No. 85 at ¶ 9).

[9] "Plaintiff's inability to pay for the repairs without the assistance of insurance proceeds and whether or not he had a job is irrelevant to the matters before the Court.  Such a position would be dangerous for the Defendant to take [as] 'the jury would [not] take it very well because that is insulting.'" (Docket No. 85 at ¶ 9, quoting counsel's reply to the Court).

[10] Plaintiff's counsel "recognizes that recusal is a seldom sought remedy" and a "drastic step".  (Docket No. 85 at ¶¶ 12, 20).  The Court appreciates that observation and agrees that a request for recusal is indeed a serious matter – one not to be taken lightly by the parties or the Court.

trial. In response to Plaintiff's objection to the Court's statements regarding his employment, Defendant averred that it was appropriate in the context of the Court's discussion of both (a) Plaintiff's burden to show that the property was his "residence", with very little documentation to support his representations of time/funds spent there in making renovations and (b) what the trial evidence would be as to damages and how Plaintiff might prove that but for Defendant's alleged breach of contract he could replace the insured property. *Cf.* Docket No. 90 at 7:2-25. *See also id.* at 7:21-23, 9:23-24 (concluding that these "inquiries about [Plaintiff]'s availability for trial, discussion of the potential evidence at trial" are "far afield from the appearance of impropriety"); *id.* at 10:15-19.

## IV. ANALYSIS

### A. Timeliness

At the outset, there is a question concerning the timeliness of Plaintiff's recusal motion. Although Plaintiff acknowledges that the parties were advised of the Court's criminal docket search "[e]arly in the proceeding" (Docket No. 85 at 1), Plaintiff made no objection prior to filing his present motion.[11] Moreover, when the Court suggested (at the May 1, 2025 hearing) that Plaintiff's lack of a job may impact his ability to take steps toward repair or replacement of the subject property,[12] Plaintiff's counsel "immediately took issue" on the ground that "whether or not [Plaintiff] had a job is irrelevant to the matters before the Court" (Docket No. 85 at 2), but counsel

---

[11] In response to the Court's observation during the May 1, 2025 hearing that Plaintiff would have time to attend trial "unless he is in jail", Plaintiff's counsel did not take exception, but merely advised the Court of his understanding as to the status of criminal charges against Plaintiff. (Docket No. 81 at 28:9-16).

[12] "Well, if plaintiff had a job, maybe he would have the money to go out and do these things." (Docket No. 81 at 33:17-18).

7

did not make any suggestion of bias (or an appearance thereof).[13]  Rather, although counsel found the Court's references to Plaintiff's criminal charges and employment status "troubling" at the time, he "waited to review the transcript", to "confer[] with fellow attorneys" and to consult his client before filing a motion for recusal.  (Docket No. 85 at ¶¶ 7, 17, 19-21).[14]

"[T]he inquiry into timeliness [of a motion for recusal] is concerned with the movant's reasonable diligence in filing".  *Furst*, 886 F.2d at 581 n.30 (quoting *Samuel v. University of Pittsburgh*, 395 F. Supp. 1275, 1279 (W.D. Pa. 1975) (vacated on other grounds, 538 F.2d 991 (3d Cir. 1976)).  "[T]he timeliness of [such a] motion turns not solely on the actual time elapsed, but on other factors as well." *Smith v. Danyo*, 585 F.2d 83, 86 (3d Cir. 1978).[15]  In particular, "timeliness should be measured . . . with respect to the future stages of the case", in order to accommodate between "the competing institutional interests in avoiding the appearance of impropriety on the one hand and avoiding abuse of the [recusal] procedure on the other".  *Id.*  Thus, for example, "courts will often consider whether the affiant has participated in substantial pre-trial motions between the time he first learned of the asserted bias and the time he filed the . . . request." *Id.*  The *Smith* Court explained that "[t]he judicial process can hardly tolerate the practice of a litigant with knowledge of circumstances suggesting possible bias or prejudice holding back, while calling upon the court for hopefully favorable rulings, and then seeking recusal when they are not forthcoming." *Id.*  See also *Furst*, 886 F.2d at 581 (quoting *Smith*); *Cooney v. Booth*, 262 F.

---

[13] At the close of the May 1, 2025 hearing, Plaintiff's counsel responded "No, your Honor" to the Court's inquiry as to whether there was "anything else for the Court's attention here today?"  (Docket No. 81 at 54:12-14).

[14] The Court notes that Plaintiff's counsel could have conferred with Plaintiff and with fellow attorneys while awaiting the transcript of the May 1, 2025 hearing (which was filed May 19, 2025); and could have reviewed the transcript in less time than the 20 days that transpired between the filing of the transcript and the motion for recusal.

[15] Although *Smith* involved a motion for recusal under 28 U.S.C. § 144 rather than under section 455, the Third Circuit has stated that because section 455 "does not establish any form of procedure for consideration of recusal motions", the courts "will look to section 144 and our case law under that recusal provision for guidance as to procedure." *Furst*, 886 F.2d at 581.

Supp.2d 494, 503-04 (E.D. Pa. 2003) ("[A] party with knowledge of facts that may implicate the need for the presiding judge to recuse himself may not sit idly by and gamble upon the outcome of a proceeding, secured in the knowledge that, if the wrong result ensues, it can always cry foul.").

In the present case, as in *Furst* and *Smith*, Plaintiff did not affirmatively "call upon the . . . court for any new rulings" between the May 1, 2025 hearing and Plaintiff's June 9, 2025 motion. *Furst*, 886 F.2d at 581; *Smith*, 585 F.2d at 86. However, unlike the movants in those cases, Plaintiff's counsel delayed in filing his recusal motion during a period when the parties knew that the Court was preparing a ruling on "substantial pre-trial motions" regarding bifurcation and damages. In the event, Plaintiff's motion for recusal was filed some 40 days after the remarks complained of, and just 12 days after the Court's issuance of an order bifurcating trial (over Plaintiff's opposition) and substantially rejecting Plaintiff's position as to damages. Although the foregoing timing might provide support for a finding of dilatoriness or opportunism,[16] the Court will nonetheless proceed to address the motion on the merits.

## B. Plaintiff's Criminal Docket

As Plaintiff notes, the Court advised the parties "early in the proceeding" that it inquired into public records/dockets regarding the existence and status of other actions, including Plaintiff's criminal docket. (Docket No. 85 at ¶¶ 1-2). As the parties are also aware, the Court does so as a matter of its routine case management procedures and as to all parties appearing before it, to inform and facilitate scheduling,[17] as the presiding Judge routinely encourages, and not infrequently

---

[16] When first presented with Plaintiff's motion for recusal, the Court observed to the parties that it is "at least coincidental to the Court that this motion would arise following the Court's rulings." (Docket No. 90 at 11:6-7).

[17] Efficient scheduling is made both more important and more challenging when (1) counsel's own schedules are restricted, (2) parties themselves may have extended periods of unavailability, and (3) the court is called upon, in the face of delays in the prosecution/advancement of the case, to expedite, to the extent possible, its own proceedings. And the availability of parties and their counsel may, of course, be significantly affected by other court appearances/trials.

requires, the parties' attendance at proceedings, particularly nearing and throughout trial.[18] The Court informed the parties that it was aware of Plaintiff's then-pending criminal (drug-related) charges.[19] The Plaintiff raised no objection, and thereafter continued to participate in case status and scheduling dialog that included reference to Plaintiff's criminal action.[20] During the May 1, 2025 hearing, Plaintiff's counsel advised the Court that the charges had been dismissed. (Docket No. 81 at 28:11-15). The charges were, however, still pending of record, and the Court later learned they were dismissed on May 28, 2025. (Docket No. 90 at 4:1-6). *Cf. id.* at 4:7-17 (reminding counsel of its awareness that the Court "followed along" the state court charges to avert/anticipate scheduling conflict).

The existence and status of Plaintiff's criminal docket was not a "disputed evidentiary fact concerning the proceeding" (as to which extrajudicial knowledge would be problematic under Section 455(b)(1)). Because, as Plaintiff has observed, any pending charges "are not convictions and would at no time be admissible at trial" (Docket No. 85 at ¶ 18), they do not constitute "evidentiary facts" in this proceeding.[21] Moreover, if the charges were somehow material to this action, the fact of their existence (*vel non*) could not reasonably be "disputed", but rather would be subject to judicial notice.[22]

---

[18] *See* Docket No. 12:19-20 (reminding parties that the Court had "made clear that [its] courtroom practices and policies are such that when we go to trial, everybody comes to trial"). It appears that Plaintiff has not yet availed himself of the Court's open invitation to appear in person before it during any proceeding.

[19] *Commonwealth of Pennsylvania v. Donald J. Jackson*, Criminal Docket No.: MJ-05003-CR-0004697-2024.

[20] The presiding judge's notes of the status conference of March 3, 2025 indicate that Plaintiff's counsel then advised her that Plaintiff had told counsel that his criminal matter would not be an issue.

[21] *Cf.* ABA Formal Opinion 478 at 6 (2017), *quoted in People for the Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of Western Maryland, Inc.*, 2018 WL 1083641 (D. Md. 2018) ("The key inquiry here is whether the information to be gathered is of factual consequence in determining the case.").

[22] *See* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). The Court notes the Rule 2.9(c) of the ABA Model Code of Judicial Conduct provides that "A judge shall not investigate facts in a matter

The Court's statement expresses its reasonable expectation that a plaintiff with – as the evidentiary record has reflected - several years' history of scant employment (and little other evidence of regular, significant demands on his time)[23] is likely to have few constraints on attendance at trial (absent an interim criminal conviction/sentencing). It was relevant to scheduling and the Court had more than once discussed it with counsel, without objection, in that context.[24]

### C. Plaintiff's Employment Status

The principal ground proffered by Plaintiff to suggest an appearance of bias is that the Court's inquiry concerning Plaintiff's employment status is irrelevant to this action. As Plaintiff frames the argument:

> Plaintiff's inability to pay for the repairs without the assistance of insurance proceeds and whether or not he had a job is irrelevant to the matters before the Court.[25] . . . .

---

independently, and shall consider only the evidence presented and any facts that may properly be judicially noticed." *But cf.* ABA Formal Opinion 478 at 3 n.9 (2017) ("There is no similar provision in the Code of Conduct for United States Judges."). Where this prohibition applies, it expressly permits consideration of "facts that may properly be judicially noticed." As stated in the Formal Opinion's analysis of Hypothetical #5, "Court records can be judicially noticed for their factual existence, and the occurrence and timing of matters like hearings held and pleadings filed, but not for the truth of allegations or findings therein." *Id.* at 10. *Compare* Hypothetical #3, indicating that under the Model Code a judge must generally "avoid using any [electronic social media] site to obtain information regarding a matter before the judge". *Id.* at 8.

[23] The Court routinely inquires into the parties' employment status in order to ensure that the presiding Judge has no connection to the parties, and to get a sense of how their personal circumstances may impact scheduling. The evidentiary record here indicates that at the time of his February, 2022 examination under oath, Plaintiff had not worked for "two" or "three years." (Docket No. 52-1 at 8:20-22). At the time of his May, 2023 deposition, Plaintiff testified that he was not working, but had worked at Home Depot and cleaning steel mills in the interval since February, 2022. (Docket No. 57-3 at 4:21 - 5:13). The Court's notes further indicate that during the October, 2022 initial case management conference Plaintiff's counsel advised the Court that his client was then working in the "gig" economy (perhaps as an Uber driver).

[24] Defendant's counsel argued at the June 9, 2025 hearing that inquiry into Plaintiff's "pending criminal charges" was also appropriate because "they could potentially have been admissible." (Docket No. 90 at 7:3-5). In response, the Court observed that "criminal history [may] come into play" if charges result in conviction of a crime involving false statement ("*crimen falsi*"), but also observed that dismissal of the charges eliminates the need for further inquiry into that issue. (Docket No. 90 at 13:8-19).

[25] As discussed below, Plaintiff's potential inability to pay for the repairs ***even with*** insurance proceeds (in the amount of the depreciated "actual cash value") is very much before the Court, and his job status is certainly relevant to that issue.

11

> Plaintiff's employment status should not be a matter that has any bearing on the duties owed by the Defendant to its insured. The Court's unsolicited reference to this fact creates a concern that it is a matter that is of greater import to the Court for whatever reason than it is to the case.

(Docket No. 85 at ¶¶ 11, 15).[26] Thus, Plaintiff contends in effect that the Court's inquiry into an (assertedly) irrelevant subject *ipso facto* creates an appearance of bias.

Whatever may be the merit of the proposition that judicial inquiry into an irrelevant subject is somehow suggestive of bias in the abstract, that proposition has no application here because Plaintiff's job status is manifestly relevant to his ability to complete repair or replacement of the subject premises, which is a key issue for the determination of damages herein. More particularly, Plaintiff asserts that his employment status "should not . . . [have] any bearing on the duties owed by the Defendant". (Docket No. 85 at ¶ 15). However, Defendant's duty toward its insured is defined by the parties' contract (the "Policy"), subject to the requirements of governing law, and here the Policy provides that Defendant only has to pay the depreciated "actual cash value" of Plaintiff's house, unless Plaintiff has completed repair or replacement.[27]

---

[26] A second proffered ground may rest in the solitary word "unsolicited" in the foregoing passage. As Plaintiff's counsel elaborated at the June 9, 2025 hearing, "the fact that . . . reference to [Plaintiff's] not having a job at times during this process was somehow referenced unbidden would perhaps give rise to the appearance that he will be looked upon differently than other people before the Court in this matter." (Docket No. 90 at 8:24 – 9:3). However, Plaintiff has not proffered any reason or authority to support the implicit contention that a court's inquiry into matters it deems germane is somehow indicative of bias merely because it is *sua sponte* (*i.e.*, "unsolicited" or "unbidden"). This ground therefore exemplifies the "unsupported, irrational or highly tenuous speculation" which cannot justify recusal under *Cooney*, 262 F.Supp.2d at 508.

[27] The Policy's limitation to depreciated value absent completion of repair or replacement is set forth in the following terms and conditions (as read into the record by the Court during the May 1, 2025 hearing):

> [A]ctual cash value . . . means the amount it would cost to repair or replace covered property at the time of loss with material of like kind and quality, ***less allowance for physical deterioration and depreciation***, including obsolescence.
> . . . .
> We will pay no more than the actual cash value of the damage until actual repair or replacement is complete.

(Docket No 81 at 8:7-11, 15:11-13) (emphasis added).

Plaintiff, who has not completed repair or replacement, seeks to be excused from this requirement on the ground that Defendant prevented him from doing so by denying coverage and refusing to pay him any damages for loss of his house.[28] Case law supporting the exception invoked by Plaintiff predicts that:

> [U]nder Pennsylvania law, an insured would be able to recover replacement cost despite noncompliance with a replacement requirement where the insurer's denial of liability and failure to pay actual cash value prevents the insured from replacing the property. However, the insured must still demonstrate that, but for the insurer's denial of payment, it would have replaced the property as required.

*Utica Mutual Insurance Co. v. Cincinnati Ins. Co.*, 362 F. Supp. 3d 265, 270 (E.D. Pa. 2019). *See also Andrews v. Brethren Mut. Ins. Co.*, 2023 WL 6690710 (M.D. Pa. Oct. 12, 2023) (citing and following *Utica*). Thus, in order to qualify for reimbursement of full replacement cost herein, Plaintiff must establish that if Defendant had paid him the depreciated "actual cash value", he would have completed repair or replacement. This necessarily entails a subsidiary inquiry into whether Plaintiff *could* have completed the replacement – *i.e.*, whether he had access to sufficient additional funds to make up the depreciation shortfall in order to complete the project prior to receiving full reimbursement.[29] And Plaintiff's employment status is certainly relevant to that inquiry.[30]

---

[28] In a colloquy at the May 1, 2025 hearing, Plaintiff's counsel confirmed to the Court that Plaintiff's contention with regard to Defendant's prevention of performance is "just the fact that . . . since [Plaintiff] wasn't paid any money beyond the alternate living expenses, that he was not in a position to replace or rebuild". (Docket No. 81 at 42:12-20).

[29] Although the parties have been less than proactive in addressing the magnitude of the depreciation adjustment – as Defendant's counsel put it, "[d]epreciation is the white elephant in the room that nobody wants to talk about" (Docket No. 81 at 23:14-15] – it seems clear to the Court that the depreciated value of a 1930s house (particularly one that had fallen subject to Sheriff's sale) is unlikely to come close to covering the cost of building a new house of like kind and quality today. Thus, the Court provisionally credits Defendant's counsel's representation that "[d]epreciation is significant in this case." (Docket No. 81 at 23:16). That being so, Plaintiff would have to be able to supplement the "actual cash value" with substantial separate resources to complete repair or replacement.

[30] For example, a mortgage lender considering a request to finance a construction loan would likely consider the borrower's employment history along with other underwriting factors.

13

Plaintiff's counsel's difficulty in appreciating the relevance of Plaintiff's employment status may arise from what the Court perceives as his fundamental misreading of the controlling contract language. No fewer than four times during the May 1, 2025 hearing, Plaintiff's counsel reiterated that "actual cash value" is defined in the Policy as the cost of repair, "period".

> [A]s Your Honor read the definition of actual cash value, it's the cost to repair.
> . . . .
> The policy defines actual cash value as the cost to repair. Period. That is whenever [actual cost value] is referenced in the policy. Your Honor read the definition. It is the cost of repair.
> . . . .
> [A]s defined in the policy, the damages are cost of repair. Period. That, as Your Honor read, that's what the actual cash value language is defined as, the cost to repair.
> . . . .
> Your Honor, I'm sorry. Actual cash value under this policy is the cost to repair. Period. . . . . You read the provision of the definition. That's what it says.

(Docket No. 81 at 15:23-24, 31:4-7, 32:14-17, 43:19-23).[31]

Because Plaintiff's counsel believes (steadfastly but erroneously) that the Policy provides for payment of the full cost of repair (*i.e.,* as the full replacement, rather than the substantially-reduced depreciated, value) prior to completion, it is perhaps not surprising that he also considers Plaintiff's employment status (along with other indicia of Plaintiff's financial resources) to be irrelevant: if Defendant were required to pay the full cost of repair in advance, Plaintiff could presumably use that payment to effectuate repair (or replacement), with no need to inquire about other sources of funds. However, under the Policy as written, Defendant is required at the outset to pay only the depreciated value, and it is incumbent upon Plaintiff to make up the shortfall from employment income or other sources in order to complete the repair or replacement and thereby

---

[31] *Compare* the actual policy definition, set forth in n.27, *supra*. As Defendant's counsel correctly observed, "[t]he actual cash value is the cost to repair less depreciation. I mean, it can't be anything else." (Docket No. 81 at 44:5-6).

qualify for reimbursement of full replacement cost. As Plaintiff's employment status is relevant to the damages at issue should the jury determine Defendant liable for coverage, the Court's inquiry into that status and its implications for the case would not lead a reasonable observer to perceive an appearance of bias.

## V.     CONCLUSION

As set forth above, after reviewing the motion – together with and in light of the full record of surrounding facts and circumstances – the Court finds that the allegations contained therein (as further explained and amplified at oral argument), amount to misapprehension of the purpose and tenor of the Court's remarks, compounded by conjecture and unwarranted inference. The unadorned facts alleged and accepted as true are legally insufficient to cause a reasonable person with knowledge of all the circumstances to believe that the presiding judge has a personal bias or prejudice against Plaintiff or in favor of Defendant, or otherwise to harbor doubt as to her impartiality in this case. Accordingly, the Court enters the following Order on this 23rd day of June, 2025:

**ORDER**

IT IS HEREBY ORDERED that Plaintiff's Motion for Recusal (Docket No. 85) is DENIED, with prejudice.

IT IS FURTHER ORDERED that a status conference will be held on **Monday, June 30, 2025** at **1:00 p..m.** in **Courtroom 5B**, during which the Court will schedule (a) any remaining pretrial motions and briefing; (b) submission of proposed jury instructions and verdict slips, and (c) any other matters conducive to an orderly and efficient trial.  The parties are to be prepared to address how they plan to (or might) address depreciation of the subject property for purposes of determining "actual cash value" under the Policy, whether in chief or in rebuttal.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

cc/ecf: All counsel of record